**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IVY ANDERSON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 23-CV-5073 |
| | ) | |
| CITY OF CHICAGO, a municipal corporation, | ) | Judge Steven C. Seeger |
| | ) | |
| | ) | |
| Defendant. | ) | JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

NOW COMES Plaintiff IVY ANDERSON, by and through his attorneys, Devlin Joseph Schoop, HENDERSON PARKS, LLC, and complains against Defendant CITY OF CHICAGO, as follows:

### PRELIMINARY STATEMENT

1.      This is an action seeking redress for the violation of rights guaranteed to Plaintiff by 42 U.S.C. §§1981 and 1983, and the Illinois Civil Rights Act of 2003, 740 ILCS 23/1, et seq. to remedy acts of race discrimination against Plaintiff IVY ANDERSON, an African-American male working for the City of Chicago Water Department ("Water Department").

### JURISDICTION AND VENUE

2.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C.§§ 1343(a)(3) and (4) and 28 U.S.C. §1331, which confers original jurisdiction in a civil action to secure protection of and to redress deprivation of rights secured by 42 U.S.C. §§1981 and 1983.  Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§2201 and 2202.  Supplemental jurisdiction over state law claims is proper pursuant to 28 U.S.C. §1367.

3.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(1) and (2), because Plaintiff IVY ANDERSON is a citizen of this judicial district and the unlawful acts of discrimination to which he was subjected occurred inside this judicial district.  Venue is further proper in this judicial district because Defendant CITY OF CHICAGO is a municipal corporation organized under the laws of the State of Illinois, transacts its business in this judicial district and/or committed the unlawful acts of discrimination alleged herein within this judicial district.

## PARTIES

4.    Plaintiff IVY ANDERSON is an African-American male citizen of the United States.  He currently resides in Chicago, Illinois.

5.    Plaintiff IVY ANDERSON is 54-years-old and has worked for the Water Department for 22 years.

6.    Plaintiff IVY ANDERSON is a former putative class member in the action *Edmond*, *et al. v. The City of Chicago*, Case No. 17-CV-4858, pending in the United States District Court for the Northern District of Illinois before the Honorable Matthew F. Kennelly.[1]

7.    Plaintiff IVY ANDERSON is pursuing this action on an individual basis to seek redress for unlawful race-based discrimination suffered, from 2016 to the present, while *Edmond* was pending as a putative class action.

8.    Defendant CITY OF CHICAGO is and was, at all times mentioned herein, an Illinois municipal corporation organized and existing as such under the laws of the State of Illinois.

## FACTS COMMON TO ALL CLAIMS

9.    At all times relevant to this action, Plaintiff IVY ANDERSON was an employee of the City of Chicago Water Department.

---

[1] There is a pending motion for reassignment of this case to Judge Kennelly on the basis of relatedness pursuant to Local Rule 40.4(C). (Dkt. 6).  Judge Kennelly has scheduled an August 23, 2023 hearing on the motion.

10.     At all times relevant to this cause of action, Plaintiff IVY ANDERSON is and was a member of a protected class -- African-American -- when the unlawful employment practices occurred.

11.     Plaintiff IVY ANDERSON is a native son of Chicago, who grew up in the rough streets of Chicago's Englewood neighborhood, avoiding crime and gang activity that all too often tragically claimed the lives of so many other African-American men, either through death or incarceration.

12.     A patriotic American determined to serve his country, Plaintiff IVY ANDERSON enlisted in the United States Navy, where he held the rank of Petty Officer E-5. His military occupational status was boiler technician and he was responsible for maintenance and repair of boilers on naval battleships, ensuring that our nation's fleet was ready when called for battle. Plaintiff IVY ANDERSON is a combat veteran who served on the battleship U.S.S. Midway during *Operation Desert Shield* and *Operation Desert Storm*, in the early 1990s. Plaintiff IVY ANDERSON later served on the U.S.S. Blue Ridge, until he was honorably discharged from Navy in 1997 after ten years of dedicated service to his country.

13.      From 1997 to 1999, Plaintiff IVY ANDERSON honed his skills as an engineer and continued to serve his country by working as a boiler engineer for the United States Embassy in Tokyo, Japan. In that capacity, Plaintiff IVY ANDERSON provided engineering technician services to the embassy's buildings.

14.     In 2001, after returning to his hometown of Chicago, Plaintiff IVY ANDERSON joined the Water Department as an "Operating Engineer – C," where he was responsible for, among other things, engineering functions relative to boilers, water filtration, air conditioning systems, HVAC systems and pumping systems, across the spectrum of Water Department

locations, both in water filtration and pumping functions, which were essential to the functions of the Water Department.

15.     During the course of his employment with the Water Department, Plaintiff IVY ANDERSON was an excellent employee who met or exceeded the employment expectations of the Water Department, as is evident from consistently favorable performance evaluations during the course of his career with the Water Department.

16.     Chicago's Water Department delivers drinking water to Chicago and suburbs and removes waste water by delivering it to Chicago's Water Reclamation District.  The Department employs approximately 2,000 people, who all report directly or indirectly to the Commissioner and First Deputy Commissioners.  The Commissioner's office coordinates all operations at the Department.

17.     All Water Department employees are subject to applicable city policies, including its Personnel Rules and its Hiring Plan.  By city municipal code and pursuant to the Personnel Rules, the Commissioner is responsible for ensuring that the Personnel Rules and the Hiring Plan are followed.   In sum, those documents collectively provide that the Water Department is prohibited from engaging in discrimination on the basis of, among other things, an employee or job applicant's race.

18.     Under Personnel Rule 21, the Commissioner of the Water Department had plenary responsibilities over Water Department management, including all personnel matters (review of disciplinary actions, equal employment opportunity, training, hiring and promotions).

19.     At all times relevant to this action, Barrett Murphy served as Commissioner of the Water Department.

20.     At all times relevant to this action, William Bresnahan was the Managing Deputy Commissioner of the Water Department.

21.     At all times relevant to this action, Joseph Lynch was the Chief Operating Engineer of the Water Department.

22.     That Commissioners Barrett Murphy, William Bresnahan and Joseph Lynch harbored racial animus toward African-Americans was an "open secret" to all employees within the Water Department.

23.     In 2017 and 2018, the Office of the Inspector General concluded that there existed within the Water Department an "unrestricted culture of overtly racist and sexist behavior and attitudes within the department . . . [and] that individuals at the highest level of the [Water Department] sent and received hateful emails over a period of at least five years.

24.     The hateful emails – frequently exchanged by and between upper management, including Bresnahan using the term "nigger" and Lynch referring to African-Americans as "you people."

25.     At all times relevant to this action, Murphy, Bresnahan and Lynch harbored discriminatory animus toward African-American employees within the Water Department, deliberately engaging in discriminatory employment practices that proliferated every aspect of the Water Department in terms of hiring, promotions and racially-motivated disparate discipline of African-American employees.  In short, Murphy, Bresnahan and Lynch commonly rigged hiring and promotion systems to cherry-pick applicants – preferably Caucasian Irish males – for promotions, despite how they lacked seniority or qualifications possessed by more qualified promotion applicants, including but not limited to, Plaintiff IVY ANDERSON.

26.     During the course of his employment, while holding the position of Assistant Chief Operating Engineer, Plaintiff IVY ANDERSON applied for promotions to the position of Chief Operating Engineer.

27.     Plaintiff IVY ANDERSON was denied promotions to the position of Chief Operating Engineer on the basis of his race, as he was passed over for promotions that were awarded to lesser-qualified Caucasian males, particularly of Irish ancestry who, in many cases, had significantly less seniority within the Department and lacked qualifications to perform the essential functions of the job.   Lesser qualified Caucasian Irish who were promoted over Plaintiff IVY ANDERSON include Tom Barrett and John Murphy.

28.     The decisions to promote Tom Barrett and John Murphy was made, directly or in part, by former Commissioners Barrett Murphy, William Bresnahan and Joseph Lynch.

29.     During the course of his employment, while working at the Filter Building of the Jardine Water Purification Plant in downtown Chicago, Joseph Lynch would deny over-time to African-American employees while generously awarding over-time to similarly-situated Caucasian employees.

30.     The discriminatory animus harbored by Murphy, Bresnahan and Lynch was not a random occurrence or limited exclusively to Plaintiff IVY ANDERSON.

31.     Like any other governmental entity, it is the "official" policy of Defendant CITY OF CHICAGO to prohibit discrimination, retaliation or harassment on the basis of protected status. But that policy was not truly practiced or enforced at the Water Department.  The "real" policy was to treat African-American employees as second-class citizens.

32.     At the Water Department, there existed a long-standing and widespread pattern and practice of discriminating against African-Americans in their employment at the Water

Department and in particular of denying African-Americans promotions, assigning African-Americans the least amount of overtime, and unfairly meting out unwarranted and excessive discipline to African-Americans.

33.     This pattern and practice of racial discrimination, as more particularly described below, is so prevalent, permanent and well-settled as to constitute an actionable "custom or usage."

34.     Murphy, Bresnahan and Lynch, directly and through junior supervisory personnel including but not limited to Paul Hansen, Luci Pope-Anderson, Jennifer Izban and Jack Lee, Murphy, Bresnahan and Lynch engaged in deliberate and unlawful policies, patterns, and employment practices to create and proliferate an objectively hostile and abusive work environment throughout the Water Department based on race.

35.     The environment at the Water Department is known to be, and is reasonably perceived as, hostile by workers.  It includes racially derogatory and unwelcome remarks and epithets, encouragement and toleration of same, violence, intimidation, retaliation, and constructive discharge against African-American employees and manifests itself in countless other ways, making the Water Department an unpleasant, difficult place to work, one plagued with omnipresent obstacles to African-Americans performing, succeeding and advancing in their work.

36.     The racial discrimination within the Water Department has been and continues to be systematic and emanates from the highest levels – from those persons with supervisory and final policymaking authority within the Water Department.

37.     Senior Water Department management communicated and knowingly condoned a policy to all of the supervisors within the Water Department that African-Americans were to be, or could with impunity be, treated with disdain, deprived of promotions, given less overtime, and harassed.

38.     In late 2017, the City of Chicago, through the Mayor, publicly acknowledged that there is a deeply ingrained *culture* of racial discrimination within the Water Department: https://chicago.suntimes.com/chicago-politics/emanuel-responds-to-ugly-testimony-by-water-management-employees/; http://chicago.cbslocal.com/2018/01/15/emanuel-defends-new-water-commissioner-amid-racist-culture-complaints/.

39.     While the City of Chicago purported to terminate some of the personnel involved in discriminatory behavior, including Murphy and Bresnahan, as well as Jennifer Izban, Paul Hansen, Irene, Caminer, and Lucy Pope Anderson, (https://chicago.suntimes.com/politics/city-hall-shuffle-budget-director-leaves-ig-stays/), in reality the City allowed the personnel to retire with full benefits or resign.

40.     Consistent with the "culture of racism", within the Water Department, the positions of Commissioner, Deputy Commissioners, and superintendents have been historically been filled principally by Caucasians and not African-Americans.

41.     By approving, disapproving and otherwise influencing particular employment actions and decisions (hiring, promotion, transfers, etc.), the Water Department's predominantly Caucasian Commissioner, Deputy Commissioners, and the superintendents established and promoted a pattern and practice of racially discriminatory employment decisions.

42.     The Commissioner, Deputy Commissioners, and the superintendents in the Water Department established and promoted a pattern and practice of engaging in racially discriminatory remarks and actions against African-American employees of the Water Department, including but not limited to calling African-Americans "shine," "nigger," "boy," "spook," "you people," and "darkie," and disciplining African-American that took offense to these comments.

43.     Consistent with Mayor Emmanuel's admitted "culture of racism", these actions were undertaken to communicate, and did communicate, to African-Americans that they were beneath the Caucasian employees in the Water Department and that they should "stay in their place."  Observing the discriminatory pattern of treatment of African-American employees and hearing the racially derogatory language, other Caucasian employees learned that racially discriminatory behavior would not only be tolerated, but that they themselves should engage in such behavior.  Many Caucasian employees did so, contributing to a hostile work environment for African-American employees at the Water Department.

44.     Racial discrimination toward African-American employees of the Water Department was and is fostered, sanctioned, implemented, and endorsed by the Commissioner, Deputy Commissioners, and the superintendents.

45.     For example, disgraced former Commissioner Barrett Murphy attended meetings at the South Water Treatment Plan (Sawyer Plant) with disgraced former Deputy Commissioner William Bresnahan where the two talked about "niggers."  The incident was reported to other supervisors and nothing was ever done to withdraw or disavow the remarks, or correct or discipline Bresnahan and Murphy.  The incident and its lack of consequences was observed by numerous employees and supervisors.

46.     Similarly, former disgraced Deputy Commissioner William Bresnahan used a racial slur in meeting directed against African-Americans and made crude remarks about African-Americans during meetings.  These slurs were heard by numerous employees and likewise were, as numerous employees knew, never disapproved, withdrawn or ameliorated.

47.     Bresnahan and Murphy also had a habit of excluding African-American employees from meetings that they should, by virtue of their job responsibilities, have attended and refusing

to interact with African-American employees by, among other things, refusing to shake hands with African-American employees or look at African-American employees when speaking to them. These actions were well known among employees and communicated to other supervisors, and that encouraged them to engage in a pattern of similar behavior toward African-American employee.

48.     Former Deputy Commissioner Bresnahan denied African-American employees offices, despite the fact that roles and titles held by African-American employees typically warranted assigning an office. Instead, Bresnahan would fill any open offices with Caucasian employees, even if the employee had a lower title than an African-American employee. By taking these acts, Bresnahan sent a message to all employees of the Water Department that African-Americans did not have any power within the Water Department and were not welcome.

49.     The pattern and practice of harassment and discrimination fostered by the Commissioners, Commissioner, Deputy Commissioners, and the superintendents was carried out by Caucasian supervisors, who, for example, moved the location where an African-American employee had parked for nearly a decade, to parking spot away from cameras, where his vehicle was immediately subject to damage, such as being keyed. These actions were intended to demonstrate, and did demonstrate, to all the African-American employees that they had no authority and would be treated negatively if they attempted to question or speak up against Caucasian employees.

50.     The daily use of racially derogatory language and disparate treatment based on the race of the employee by the Senior Management of the Water Department confirms the culture of racism that Mayor Emmanuel decried but for so long did not address or remedy, and predictably sent a clear message from the top to all employees of the Water Department that the pattern and

practice of making racially derogatory remarks was endorsed and participated in by policymakers, i.e., those in charge of hiring, promotion, work assignments, etc. Other supervisors and employees foreseeably and reasonably understood, from the actions of Senior Water Department Management (and inactions), that racially offensive conduct against African-Americans would be tolerated and condoned.

51.     For example, senior African-American employees were assigned to the "shut off crew" (one of the most difficult jobs within the Water Department) in Englewood and the West Side (two of the most dangerous neighborhoods in the City) and often suffered injuries as a result.

52.     African-American employees injured on the job were told that they could not return to work on anything less than full-duty, while injured Caucasian employees were allowed to return to light-duty positions that were found for them. Injured African-American employees would then be forced to retire, at less than full benefits, once workers' compensation benefits were exhausted.

53.     African-American employees are humiliated, harassed, denied opportunities for advancement and additional pay, and threatened daily as a result of the conduct of the Defendant CITY OF CHICAGO, creating a hostile and abusive work environment that was and is reasonably perceived as such by Plaintiffs and other African-American workers and perpetuated, sustained, and created by deliberate acts allowed, sanctioned, and encouraged by the Defendant CITY OF CHICAGO within the Water Department.

54.     For example, experienced African-American employees, such as Plaintiff IVY ANDERSON would be expected to train Caucasian employees, who would then be promoted in a year or two after arriving, while the African-American employee would be passed over for promotion and the pattern would repeat. The numerous ways African-Americans would be denied promotions all are reflective of the overall culture of racism at the Water Department.

Examinations for jobs would be given in pencil so that answers for the Caucasian employees could be altered later to increase their scores, or results could be completely fabricated. For example, a plumbing inspector examination was administered with only one Caucasian observed taking the examination, yet three or four Caucasians were designated as the highest scoring employees on the exam. Interviews (purporting to be oral examinations of job duties) would be given for positions and senior African-Americans with far more experience than Caucasian employees would be told that they had failed the interview by interviewers (such as Murphy and Bresnahan) who had no experience in the subject matter (such as plumbing), and Caucasian employees would be given higher interview marks and be promoted. Sometimes, jobs were also not openly posted, and African-Americans would not learn of the existence of the position until after the posting closed and only Caucasian employees applied.

55.     On other occasions, African-Americans' applications would be "lost," so Caucasian employees could be selected without opposition. Other times, African-Americans would be told that they do not meet the "qualifications" for a position and be barred from applying, despite possessing the qualifications necessary to apply. Experienced African-Americans, who had even "acted up" (performed the duties of a higher position) have been and were unable to obtain promotions, despite being more qualified and having trained numerous Caucasian employees who were promoted over them with less seniority and less experience.

56.     The Commissioner, Deputy Commissioners, and the superintendents engaged in discriminatory acts against all African-American Water Department employees, which constituted a moving force assuredly designed to prevent opportunities for all African-American employees, including Plaintiff IVY ANDERSON, to enjoy the terms and conditions of his employment with the Water Department, including:

a.   Creating, encouraging and tolerating a hostile work environment;

b.   assigning less desirable work assignments;

c.   assigning less overtime;

d.   denial of promotions - "Glass Ceiling";

e.   denial of transfers, shifts, and days off - "Glass Wall";

f.   subjecting them to unwelcomed racial intimidation and harassment;

g.   subjecting them to harsh and undue discipline; and

h.   subjecting them to retaliatory, adverse actions.

57.   As part of the culture of racism at the Water Department, the Commissioner, Deputy Commissioners, and the superintendents used criteria and methods of administration in making personnel decisions described herein that discriminated against African-Americans based on their race or had the effect of discriminating against them based on their race, particularly as compared to Caucasians.

58.   The hostile work environment for African-Americans created by Defendant CITY OF CHICAGO is demonstrated by, among other things, email traded by the Senior Management of the Water Department and other supervisors on their City of Chicago computers, on City of Chicago time, and using their City of Chicago email addresses.  The emails described below are examples of the numerous messages that were openly circulated by Caucasian Commissioners, chiefs, and supervisors.

59.   The Senior Management of the Water Department sent or were recipients of email messages that contained racially derogatory content targeted at African-Americans.  The Senior Management of the Water Department were recipients of such messages because other employees

of the Water Department were aware of the Senior Management of the Water Department harbored racial animus towards African-Americans.

60.     The distribution of racially derogatory messages within the Water Department was well known among the Water Department Commissioners, Deputy Commissioners and the superintendents. The transmission of racially derogatory messages about African-Americans demonstrated that the highest levels of the Water Department were hostile towards African-Americans and would endorse and countenance similar conduct and statements by other Water Department employees.

61.     For example, Deputy Commissioner Alan Stark would condone and encourage racist remarks and behavior by not disciplining Caucasian people who sent cartoons and other negative information (*e.g.*, crosses and swastikas) to African-American employees. This was well known throughout the Water Department, yet Stark was never disciplined.

62.     Likewise, disgraced former Deputy Commissioner William Bresnahan traded racially derogatory messages with former colleagues in the in the Chicago Police Department (where Bresnahan formerly worked), including an email message about a black lady's driver's license and her "ethnic" name and an email message about "niggers" or "nigger Leprechauns." Setting a public example for others in the Water Department, Bresnahan laughed and joked about the messages openly in front of other Water Department employees, as was well known throughout the Water Department, but Bresnahan was never reprimanded or disciplined.

63.     Similarly, Paul Hansen,[2] a Superintendent of the Water Department and a policymaker, shared racially derogatory emails with Senior Management of the Water Department.

---

[2] Paul Hansen is the son of 44th Ward Alderman Bernie Hansen, and Paul Hansen believed that based on his lineage and connections to the Emanuel administration that he could treat African-American employees negatively without any repercussions.

For example, Hansen sent a link to an online video showing several Kenyans unsuccessfully trying to fly an aircraft they had built, stating: "They are human beings. Just like us! Only 100 years later."

64.     Other racist emails shared among Hansen and other Water Department include:

a.    an email touting a fake "Chicago Safari" package, referencing the number of shootings during a July Fourth weekend, and guaranteeing that tourists would observe "at least one kill and five crime scenes" and also see "lots of animals in their natural habitat;"

b.    messages purporting to be in "Ebonics,[3]" and a "humorous" picture supposedly describing a swimming pool for a small African-American, but which actually depicted a child sitting in a bucket filled with water while holding a slice of watermelon; and

c.    "Watermelon Protection" email that featured a picture depicting a Ku Klux Klan scarecrow guarding a field of watermelons:





---

[3] "Ebonics," intended to be derogatory in this context, refers to the vernacular use of English by some African-Americans.

65. Other racially derogatory email exchanges between Hansen and disgraced former Commissioner Barrett Murphy, and other supervisors were summarized by the Chicago Tribune as follows:

> Another racially insensitive email dates back to February 2013, when Hansen was replying to an email that Murphy first forwarded to him. The original message concerned an 'urgent request' from ComEd to stop work near an alternate power line serving schools, a fire station and senior citizen homes until the main line was fixed so those facilities wouldn't lose their electricity feed if it were accidentally damaged.
>
> In response, Hansen wrote: 'I think the only thing that the line does not feed is the center for the severely challenged negro midgets, you know the place, its where we hired all those laborers from 7 years ago.' Murphy then forwarded that message to another department employee.
>
> Even an August 2015 note from Murphy describing an equation for calculating the circumference of a circle drew a convoluted, racially charged attempt at humor from Hansen.
>
> Hansen's message referred to the sex organs of white and black men, Caitlyn Jenner, Bill Cosby, a Confederate flag, and Dorothy and the Tin Man. Within minutes, Hansen then forwarded the same distasteful message to Durkin, whose response included: 'I'll have to get back to you with my answer after I discuss this with the All Powerful OZ.'

*See* Hal Dardick, Ray Long and Todd Lighty, *Newly released racist, sexist emails show scope of scandal at Chicago's water department*, Chicago Tribune, July 14, 2017, available at:

http://www.chicagotribune.com/news/local/politics/ct-chicago-water-department-emails-met-20170714-story.html.[4]

66. Water Department employees were encouraged, through the distribution of racially derogatory messages, language, and disparate treatment of African-Americans that they should

---

[4] The City of Chicago refused to disclose the actual emails, despite repeated FOIA requests.

reinforce the pattern and practice of treating African-American employees of the Water Department similarly.

67.    African-American employees of the Water Department are subjected to racist images, such as a hangman's noose in restrooms and Water Department vehicles:



68.    The racial slurs, insults, and intimidation were unwelcome by African-American Water Department employees.

69.    The hostile conduct fostered and encouraged by the Commissioners and supervisors was sufficiently severe or pervasive to alter the conditions of employment for all African-American Water Department employees, creating a physically abusive and hostile work environment where employees like Plaintiff IVY ANDERSON could easily be denied overtime and promotion opportunities, as he has alleged herein.

70.    The hostile work environment is pervasive throughout the entire Water Department, and was created, condoned, and encouraged by the Senior Water Department Management.

71.    The hostile work environment included acts of physical violence and intimidation against African-American employees of the Water Department.

72.    For example, Deputy Commissioner Alan Stark was aware that Anthony Nguyen was likely to commit acts of violence against black employees, but when the acts occurred and were reported to him, Stark would not discipline Nguyen.  Not only did Stark not discipline Nguyen, but knowing Nguyen's proclivity for violence against African-Americans, Stark would place black employees near Nguyen and would then discipline the black employees, but not Nguyen, whenever a Nguyen caused a disturbance.  Stark engaged in this pattern and practice of discrimination to create a work environment so unpleasant that black people would quit to avoid the risk of being fired or disciplined.

73.    Similarly, Joseph Lynch was, at various times, involved in attempts to physically attack African-American employees, including Plaintiffs Eddie Cooper (at Sawyer – South Plant) and Anton Glenn (also at South Plant).  Conversely, Lynch never attacked Caucasian Water Department employees, which demonstrated (to all Water Department employees) the policymaker's endorsement and encouragement of a pattern and practice of intimidating African-American employees.

74.    Defendant CITY OF CHICAGO, through the Commissioners, supervisors, and policymakers at the Water Department have a practice of discriminating against African-American employees of the Water Department.

75. Defendant CITY OF CHICAGO have a practice, pattern or policy of not promoting, refusing to transfer, and assigning less overtime to African-American employees, which was the "moving force" of the injuries suffered by Plaintiff IVY ANDERSON, as alleged herein.

76. For example, Alan Stark intentionally gave African-Americans unfavorable work assignments (*e.g.*, by sending them to far away or inconvenient places), disciplined black employees while giving a pass to Caucasian employees for the same infractions, and promoted less experienced and or unqualified Caucasians over more experienced and qualified black employees.

77. The opportunity for promotion, transfer, and overtime for employees within the Water Department was and is negatively affected by employees' race.

78. Plaintiff IVY ANDERSON, in effect, and as direct, proximate and foreseeable result of Defendant CITY OF CHICAGO'S unlawful conduct, blocked by a "Glass Ceiling," a transparent barrier of racism obstructing opportunities for upward movement and advancement afforded to other employees of the Water Department.

79. Defendant CITY OF CHICAGO created a practice and scheme that requires African-American employees to work far longer than Caucasians and apply more times than Caucasians in order to receive a promotion.

80. Defendant CITY OF CHICAGO refused and refuse to promote, or delay promoting, qualified African-American employees because of their race, even though African-Americans have sufficient seniority, experiences, and performance history to qualify for promotions.

81. African-Americans must apply for promotions to open positions many times before they are promoted, as was the case with Plaintiff IVY ANDERSON.

82.     Caucasians, by contrast, are frequently promoted on the first attempt; and often, Caucasian applicants are selected for a promotion before applications are received or interviews are conducted.

83.     Instead of promoting and filling open positions fairly and without regard for race, Defendant CITY OF CHICAGO deliberately and as part of a pattern, practice, and custom leave positions unfilled until a handpicked Caucasian candidate is designated.

84.     Defendant CITY OF CHICAGO systematically deny African-Americans the opportunity to advance as compared to Caucasian employees.

85.     African-American employees are deterred from, and refrain from, applying for promotions and transfers because of the Defendants' practice of refusing to promote or transfer African-Americans.

86.     Despite their desire to advance, many African-American employees remain in the same position for extended periods of time because they applied for a promotion on numerous occasions, but were denied a promotion on the basis of their race, as happened to Plaintiff IVY ANDERSON, as alleged herein.

87.     For example, disgraced Former Commissioner Bresnahan deliberately overlooked highly qualified African-American employees up for promotion and instead promoted Caucasians. Bresnahan would also design job descriptions for positions to ensure only specific Caucasian employees qualified for the position.  Other times, African-American employees were told that they had missed scheduled interviews (after not informing the employee of any interview) and that they would not be considered for a promotion.

## COUNT I

**RACE DISCRIMINATION – 42 U.S.C. §1981 BY OPERATION OF 42 U.S.C. §1983 – *MONELL* LIABILITY AGAINST THE CITY OF CHICAGO**

88.     Each of the foregoing paragraphs are incorporated as if restated fully herein.

89.     Throughout the course of his employment with Defendant CITY OF CHICAGO, Plaintiff IVY ANDERSON performed to Defendant's reasonable and legitimate expectations at all times.  Any assertion to the contrary is pretextual.

90.     Nonetheless, Defendant CITY OF CHICAGO, by and through its agents and employees, former Commissioners Barrett Murphy, William Bresnahan and Joseph Lynch, harbored discriminatory animus toward African-American employees, which became the unofficial policy, custom and practice of Defendant CITY OF CHICAGO to subject African-American employees to discrimination.  As a direct and proximate cause of that policy, custom and practice, Defendant CITY OF CHICAGO subjected Plaintiff IVY ANDERSON to intentional discrimination on the basis of his race, African-American, by: (1) denying Plaintiff IVY ANDERSON promotions to the position of Chief Operating Engineer, which were given to less qualified similarly-situated Caucasian employees of the Water Department; and (2) denying Plaintiff IVY ANDERSON overtime, which was given to similarly-situated Caucasian employees of the Water Department.

91.     As a result of Defendant CITY OF CHICAGO's discriminatory conduct, Plaintiff IVY ANDERSON has suffered injury to his career, including but not limited to, lost and foregone wages and benefits, and physical and emotional harm created by the stigma of being subjected to race-based discrimination.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff IVY ANDERSON prays for judgment against Defendant CITY OF CHICAGO and respectfully requests that this Honorable Court:

A.      Declare the conduct of Defendant CITY OF CHICAGO, to be in violation of rights guaranteed to Plaintiff IVY ANDERSON under appropriate federal law;

B.      Grant a permanent injunction restraining Defendant CITY OF CHICAGO, its officers, successors, assigns and all persons in active concert or participation with them, from engaging in any employment practices that unlawfully discriminates on the basis of race;

C.      Order Defendant CITY OF CHICAGO, to make whole Plaintiff IVY ANDERSON, by providing affirmative relief necessary to eradicate the effects of Defendant CITY OF CHICAGO's unlawful employment practices;

D.      Order Defendant CITY OF CHICAGO, to pay lost, foregone, and future wages to Plaintiff IVY ANDERSON;

E.      Grant Plaintiff IVY ANDERSON, any actual, consequential, compensatory, punitive and other damages, back-pay, pre- and post-judgment interest, and all other relief that the Court may deem appropriate at the time of trial;

F.      Grant Plaintiff IVY ANDERSON his attorney's fees, costs and disbursements; and

G.      Grant Plaintiff IVY ANDERSON such further relief that the Court deems necessary and proper in the public interest.

**COUNT II**
**RACE DISCRIMINATION – 42 US.C. §1983 EQUAL PROTECTION AND DUE PROCESS CLAUSES OF FOURTEENTH AMENDMENT *MONELL* LIABILITY AGAINST THE CITY OF CHICAGO**

92.     Each of the foregoing paragraphs are incorporated as if restated fully herein.

93.     Throughout the course of his employment with Defendant CITY OF CHICAGO, Plaintiff IVY ANDERSON performed to Defendant's reasonable and legitimate expectations at all times.  Any assertion to the contrary is pretextual.

94.     Nonetheless, Defendant CITY OF CHICAGO, by and through its agents and employees, former Commissioners Barrett Murphy, William Bresnahan and Joseph Lynch, harbored discriminatory animus toward African-American employees, which became the unofficial policy, custom and practice of Defendant CITY OF CHICAGO to subject African-American employees to discrimination.  As a direct and proximate cause of that policy, custom and practice, Defendant CITY OF CHICAGO subjected Plaintiff IVY ANDERSON to intentional discrimination on the basis of his race, African-American, by: (1) denying Plaintiff IVY ANDERSON promotions to the position of Chief Operating Engineer, which were given to less qualified similarly-situated Caucasian employees of the Water Department; and (2) denying Plaintiff IVY ANDERSON overtime, which was given to similarly-situated Caucasian employees of the Water Department.

95.     As a result of Defendant CITY OF CHICAGO's discriminatory conduct, Plaintiff IVY ANDERSON has suffered injury to his career, including but not limited to, lost and foregone wages and benefits, and physical and emotional harm created by the stigma of being treated subjected to race-based discrimination.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff IVY ANDERSON prays for judgment against Defendant CITY OF CHICAGO and respectfully requests that this Honorable Court:

A.      Declare the conduct of Defendant CITY OF CHICAGO, to be in violation of rights guaranteed to Plaintiff IVY ANDERSON under appropriate federal law;

B.      Grant a permanent injunction restraining Defendant CITY OF CHICAGO, its officers, successors, assigns and all persons in active concert or participation with them, from engaging in any employment practices that unlawfully discriminates on the basis of race;

C.      Order Defendant CITY OF CHICAGO, to make whole Plaintiff IVY ANDERSON, by providing affirmative relief necessary to eradicate the effects of Defendant CITY OF CHICAGO's unlawful employment practices;

D.      Order Defendant CITY OF CHICAGO, to pay lost, foregone, and future wages to Plaintiff IVY ANDERSON;

E.      Grant Plaintiff IVY ANDERSON, any actual, consequential, compensatory, punitive and other damages, back-pay, pre- and post-judgment interest, and all other relief that the Court may deem appropriate at the time of trial;

F.      Grant Plaintiff IVY ANDERSON his attorney's fees, costs and disbursements; and

G.      Grant Plaintiff IVY ANDERSON such further relief that the Court deems necessary and proper in the public interest.

<u>**COUNT III**</u>
**ILLINOIS CIVIL RIGHTS ACT OF 2003, 740 ILCS 23/1 *et seq.***

96.     Each of the foregoing paragraphs are incorporated as if restated fully herein.

97.     The Illinois Civil Rights Act of 2003, Section 23/1 of the Illinois Compiled States 740, prohibits, among other things, racial discrimination by units of local government in Illinois.

98.     Defendant CITY OF CHICAGO is a unit of local government in Illinois.

99.     Defendant CITY OF CHICAGO subjected Plaintiff IVY ANDERSON to racial discrimination during the course of his employment with the Water Department on the basis of his race in violation of the Civil Rights Act, 740 ILCS 23/1 *et seq.*, by: (1) denying Plaintiff IVY ANDERSON promotions to the position of Chief Operating Engineer, which were given to less qualified similarly-situated Caucasian employees of the Water Department; and (2) denying Plaintiff IVY ANDERSON overtime, which was given to similarly-situated Caucasian employees of the Water Department.

100.     As a result of Defendant CITY OF CHICAGO's discriminatory conduct, Plaintiff IVY ANDERSON has suffered injury to his career, including but not limited to, lost and foregone wages and benefits, and physical and emotional harm created by the stigma of being treated subjected to race-based discrimination.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** Plaintiff IVY ANDERSON prays for judgment against Defendant CITY OF CHICAGO and respectfully requests that this Honorable Court:

A. Declare the conduct of Defendant CITY OF CHICAGO, to be in violation of rights guaranteed to Plaintiff IVY ANDERSON under appropriate state law;

B.  Grant a permanent injunction restraining Defendant CITY OF CHICAGO, its officers, successors, assigns and all persons in active concert or participation with them, from engaging in any employment practices that unlawfully discriminates on the basis of race;

C.  Order Defendant CITY OF CHICAGO, to make whole Plaintiff IVY ANDERSON, by providing affirmative relief necessary to eradicate the effects of Defendant CITY OF CHICAGO's unlawful employment practices;

D.  Order Defendant CITY OF CHICAGO, to pay lost, foregone, and future wages to Plaintiff IVY ANDERSON;

E.  Grant Plaintiff IVY ANDERSON, any actual, consequential, compensatory, punitive and other damages, back-pay, pre- and post-judgment interest, and all other relief that the Court may deem appropriate at the time of trial;

F.  Grant Plaintiff IVY ANDERSON his attorney's fees, costs and disbursements; and

G.  Grant Plaintiff IVY ANDERSON such further relief that the Court deems necessary and proper in the public interest.

## **JURY DEMAND**

Plaintiff IVY ANDERSON hereby demands a trial by jury pursuant to Federal Rule of

Civil Procedure 38(b) on all issues so triable.

Date:   August 9, 2023

Respectfully submitted,

/s/Devlin Joseph Schoop
Devlin Joseph Schoop
One of the Attorneys for Plaintiff Ivy Anderson

Devlin Joseph Schoop
Christopher W. Carmichael
**HENDERSON PARKS, LLC**
140 South Dearborn, Suite 1020
Chicago, IL 60603
Phone: (312) 262-2900
Facsimile: (312) 262-2901
dschoop@henderson-parks.com
ccarmichael@henderson-parks.com